We are here to hear the case of United States v. Villavicencio. I want to thank, before we get started, Chief Judge Thomas Johnston from the Southern District of West Virginia for taking time from his busy schedule to join us this morning and be a part of this panel. We really appreciate your pitching in, Judge Johnston. Thank you very much. We are prepared to hear argument. We will start with Mr. Marsiliad. Am I pronouncing that correctly? Yes, Your Honor. Thank you. You may proceed. May it please the Court. The appellants are before this Honorable Court today to argue that Trooper Weissman's actions clearly violated the Fourth Amendment against unreasonable searches and seizures for three primary reasons. First, the stop was unlawfully extended just over eight minutes into the stop when the audible tone sounds on the trooper's system that's running record checks and it comes back clean. Second, pursuant to the Bowman case, at the time of that extension of the stop, the facts known to the trooper were not sufficient to give rise to reasonable suspicion. And third, the consent to search given by Mr. Rivero more than 25 minutes into the stop was invalid and did not grant valid consent because that consent was vitiated by the earlier unlawful prolongation of the stop. Now, before I get into those substance points, I do want to address something that I wouldn't normally, and that is to apologize to the Court for some via Vicencio. And unfortunately, I didn't get to be involved in the drafting of the brief. When I read it, I was somewhat dismayed at some, I think, unnecessary language in that brief, which I'm sure the Court couldn't help but notice. We do apologize to the Court for that, and we hope that this panel will not hold that language against our clients in this situation. And I do hope to refocus the attention on what we think is a very strong argument, that the trial court did get this wrong. Now, returning to those three points that I mentioned earlier. First, we would argue to this Court that the stop was extended beyond the time reasonably necessary to effectuate the stop's mission, which was a traffic violation for speeding on I-95. Just about eight minutes into the stop, when you hear a very clear, audible doppler tone on Trooper Weissman's vehicle that you can hear on the video, and we have submitted two video files to the Court that are now part of the supplemental appendix. That was something that was done more recently after I became involved in the case. We wanted to make certain that the Court had access to this video, because the video tells the story much more effectively than I will be able to. And that's something that I'll repeatedly mention. Now, Mr. Marcelli, the Trooper obviously testified at the hearing in this case, and we do have the advantage of the video, to get to this at some point. But what portions of the, if any, of the Trooper's testimony do you suggest may be contradicted by that video? Well, I think a couple of things, Judge. I think both her testimony and the trial court's conclusions of law, which we disagree with, would be that she was acting, you know, she's an experienced Trooper. Sorry, I need to raise my hand and let you know when I stop, when I want to ask you a question. A more fundamental question. Generally, we accord great deference to a trial court's findings of fact, and particularly with respect to credibility. And the district court judge in this case made some credibility determinations. How are we to assess that in light of the video that is now part of the record? Sure, Judge. I think that's an excellent question. I think what we take issue with is much more the conclusions of law than the findings of fact. The findings of fact that Judge Devere entered, I don't have any particular dispute with any of those findings. It's the conclusions of law, which this court will review, as you know, de novo, that we take great issue with. And that is the overall conclusion that she had reasonable articulable suspicion to extend the stop, and at what point that would have occurred. And I think the primary place where Judge Devere and I had a disagreement, this came up in oral argument when I was having colloquy with Judge Devere. And he pressed me, as he should, on what exact point did I say the stop was being extended. And I said to him, as I'm arguing again today, that it's when you hear that audible ping, that's about the eight minute mark when those record checks come back. Yes, Judge. Counsel, I've got a question, because I understand there was an argument made below, both about after the warning was given, and then alternatively when the ping occurred. And I see in the trial record where you made both those arguments. What I don't see is in the appellate briefing any argument about the, you know, what you call the Doppler ping. The appellate brief, when I read, you know, at page 20 and elsewhere, all appears to be making the sole argument that once the warning was provided, that at that point the stop was extended when the trooper went and spoke with Mr. Rivera. So help me understand, based on the brief that you submitted, and I understand it's not you personally, but on behalf of your client was submitted, what in that brief allows me to look at this eight minute question? I mean, I frankly had not looked at that very closely, because it didn't seem to me that your brief made that the appellate brief that was submitted on behalf of the appellants does argue. And I think even if this court finds that I'm not allowed now to advance the same argument that I made in front of the district court, and that is part of the record, that is part of the joint appendix, in the motion that I submitted on behalf of my client in the district court. So I would argue that that argument is preserved, because we did advance it in front of Judge Devere, and we did do so in writing and on the record in the district court. But even if the court finds that we've somehow waived that argument by not advancing it in our appellate brief, we would still argue there was not reasonable suspicion, even at the end of the encounter. But I do want to spend some time briefly just going back over some of the facts, because I think they're a little bit muddled in the brief, and I want to make sure that there's a very clear pattern of exactly what happens and when it happens. Counsel, before you get to that, and I appreciate your candor with the court on the what issues are being raised, but before you turn to the general facts, specifically with respect to the conversation with Mr. Rivero, after the warning has been provided to your client, is it your position the trooper was not entitled to determine if the rental car was, you know, being possessed by someone who had rented it or had authority to be driving the car, given the discrepancy in names? So at the moment he hands the warning over to the driver, is he then precluded from asking about the rental agreement from the person who, at least is alleged to have rented the car, though in a different name? She's not precluded from doing that. There's no North Carolina law that would have been violated, and we actually have case law on that that we cited at the level below. That's true, but the court says in Rodriguez and others that the officer in the normal incident of a traffic stop, they can check things like license, insurance, and registration. I take it from our cases that a rental car agreement is the equivalent of registration in these kinds of contexts, and so what I'm just asking is, and maybe the argument is they did too much of it, but wasn't the trooper entitled incident to the stop to at least ask about the rental agreement from the person who's alleged to have rented the car? Yes, Your Honor, absolutely. I think the problem is the utter lack of diligence in getting to that point. There has been some acknowledgement in the DiGiovanni case and others that there's kind of more than one way to prolong a stop, and one thing we really want to highlight to this court today is that in this case, it's not enough to just do this backward-looking analysis and kind of where she ultimately ended up, but we have to look at each step along the way, and when you watch the jumps off the screen or off the audio, at every particular thing she does, she's taking far longer than an otherwise diligent stop should and really would take to do those things. So by the time we get to the point of asking about the rental agreement, for instance, she doesn't even start to run Via Vicencio's license until they've already been inside that patrol car for four minutes. So just to go back briefly to that overall recitation that I just quickly want to run the court through because I think it's so vital to our argument and not so clear in the brief, four minutes into the stop, they get into her patrol car. When you say four minutes, just so, I'm sorry, right here, help me understand because the court made factual findings based on, you know, a clock time. When I look at the video, I see just like minutes and seconds. Can you just make sure that I'm when you say four minutes into the stop, what is the starting point that you're basing that on? Great. So I can also refer the court to the minute mark on the video. The stop occurs about two minutes into the video. So all of the times that I would be giving the court would be off by about two minutes. Alternatively, I can tell the court six minutes at the six minute and forty five second mark on the video is when they enter her patrol car. At the ten minute and thirty second mark, so roughly four minutes later, is when she finally mentions that she's going to check his license and ask him if it's going to be valid. But to be, I mean, I just want to make sure we're being precise. When you, at 640, I've got that, 640 on the timeline, that's when he gets in the car. She doesn't get in the car until a minute later when she walks around the car and gets in. Those times, it's not that they get in at 640. He gets in at 640. She gets in at 715 or 720 or something like that. It takes her a moment to walk around to her side of the car. That's correct. There's probably a 30 second lag in those two things. That's correct, Your Honor. And then at the 1056 mark, what I'm on the video is when we hear that audible Doppler tone that, you know, we find to be so important because that's when she says the record checks come back and there's no problem with them whatsoever. And I think it's important to note, you know, there's only about a 30 second difference between when she tells him she's going to run his license and ask him if it's going to be good and when those record checks come back. So a lot of times in these cases, there's discussion by courts. You know, it is factually specific and sometimes it takes longer for these checks to come back than others. But in this case, it came back remarkably quickly. Those databases returned very quickly. Now, it's not until... Mr. Farsiliad, if I may, I want to be sure I understand your position as to when you believe this stop was extended because I thought I heard you say in response to Judge Richardson's questions that the trooper was well within her rights to after issuing the warning ticket to step out of the car ask or request that VLAB incensor your client remain in the patrol car while she investigated and talked with Rivera about the rental agreement. Is it... I thought your position was that the stop was unlawfully prolonged right after she issued the warning ticket. Did I... Am I... Is that not right? Your Honor, my position is that she unlawfully prolonged the stop well before that because she... I thought I heard you say that she was entitled to investigate the rental agreement. If that's part of the stop, if that's the case, then why would the stop have been prolonged? So, your Honor, let me clarify. As a general proposition, as I understood the judge's question, as a general proposition, it's okay to examine the rental agreement. But in this case, she had already violated the appellant's rights before she asked you to do that. Okay. When do you say that happened again just so that we all understand that? When do you say the stop was unlawfully prolonged? At the 10 56 mark on the video, eight minutes into the stop when we hear the audible doppler tone. It is when it unlawfully prolongs the stop. And that's really highlighted when you go back and look at the video. You know, there's extensive conversation on the pronunciation of his name. Just to be... Again, I don't want to be overly precise here, but when you claim the record check comes back at 10 56, I'll accept that as a given. Is it your position that the trooper was not then entitled to write a warning ticket or write anything so as soon as it comes back, the trooper's got to push them out of the car and drive off? I mean, that can't be... I don't think that's your position. But you're saying it's unlawfully extended at that point. It seems like to me that you've got to agree that there was time permitted for a decision to write a warning ticket or write a ticket or whatever it is that happens in these cases. The records check back and you push the person out of the car and drive off, right? I agree with exactly the proposition of your question. No, she is entitled to a reasonable amount of time to affect the incidence of the traffic stop. The reason it's so hard in this case to peg a precise time where it's extended is because every step that she's allowed to do, she takes significantly longer than it should take because of this questioning that is unrelated to the stop's initial justification. So, let's remember, she spends multiple, multiple minutes, I think about four minutes, questioning him unrelated to the stop before she even starts to run his record. So, it's very difficult to peg a precise time. I would say within a reasonable time after the record check comes out and she has time to write a warning ticket is when the stop is prolonged. And she keeps him long past that point just yet. Mr. Marcellia, is it your position that the trooper was not allowed to ask any questions? She's just simply supposed to remain mute in the patrol car and do what she needs to do with respect to the incidences of the stop? No, she's allowed to ask questions as long as those questions do not measurably prolong the stop itself. And we've obviously abandoned the previous de minimis standards. So, it's, you know, obviously a little bit more of a fact-specific inquiry now than it might have been pre-Rodriguez. She's allowed to ask questions, but what she's not allowed to do is completely deviate from the mission of the stop into an unrelated drug investigation, which is exactly what she did here. Fourteen and a half minutes into the stop, she finally mentions that she's starting to write him a warning ticket. Now, they've been in the car for ten minutes at this point. We're a little bit over your time. I'll let you save some time for we'll hear from the from the government. Good morning, your honors. May it please the court, Evan Rickey on behalf of the United States. The government is here this morning asking this court to affirm the judgment of the district court which denied the defendant's motion to suppress. The legal standard as discussed by which this court would review the matter is that the court's factual findings are reviewed for clear error, with the evidence construed in the light most favorable to the government, while the district court's legal conclusions are reviewed de novo. And in preparing for this oral argument, your honors, it struck me that we're not really disputing very much as to what the law of the circuit says. Rather, this case really boils down to a gulf between the appellants and the government, and the way in which we understand the facts, the way in which we understand what happened, the sequence of events from the moment that Trooper Weissman activated her lights and sirens to the moment that Mr. Rivero signed the consent form. And we believe that for this reason, the standard of review of clear error can help focus our attention on what is most salient rather than engaging in speculation about what the trooper could have done, what she should have done, different ways in which she could have approached the stop. And I think... Counsel? Yes, yes. Sorry, I'm trying to figure out which way it goes. There it is. To return to Judge Diaz's question from earlier about what we review and in what standard in light of the video, is it the government's view that the determination of diligence, you know, the district court says, I've watched the video, I've listened to the testimony, and I find that the officer acted diligently. Is that a factual determination that we review for clear error, or is that a legal conclusion that we review afresh? I think that is a factual determination that this court would review for clear error. And it's our position that the district court was not clearly erroneous in finding that Trooper Weissman acted diligently under the circumstances. And so that would be the flip as well, if a district court looked at a video and listened to the testimony and determined that the officer was dilatory for some reason or acted in a manner to delay, that too would have been entitled to sort of clear error review. Yes, Your Honor, it would. That is our position. And as we look at the district judge's factual findings, I think the two most important ones is the district judge's findings that Trooper Weissman was very experienced and that she was an extremely credible and believable witness. That was one of his primary findings. And the other finding that the district judge made was that given due weight to Trooper Weissman's training, her experience, and her observations at the scene, and the district court's independent review of the record, Weissman developed a reasonable suspicion of criminal activity by collectively assessing the totality of the facts and thereby eliminating a substantial portion of innocent travelers. And the district court specifically cited to the McCoy decision in making that factual finding. And I think, you know, as we look at the facts here, I've kind of break this down into three component parts. The first being the initial stop, 1043 a.m. up to 1101 or 1102 a.m. when the trooper issues the warning citation. Then we have the period, that eight-minute period, between the time where the warning ticket is issued and the point where Rivero signs the consent form, which is 1102 to 1110 a.m. And the one area where I think we do agree with the defense that if the court were to find that the stop was impermissibly prolonged and if the court were to find that there was not reasonable suspicion to prolong the stop, then certainly that consent goes out the window. But our position is that there was reasonable suspicion that it was appropriate looking at a totality of the circumstances for that stop to be extended for that eight-minute period of time. Is there, counsel, is there any particular fact that you think that is most supportive of this understanding that you have to take all of them into consideration? It's a totality of the circumstances test, but what fact do you think Judge Dever could reasonably rely on in deciding that would have been most probative of something criminal activity being afoot? I think the fact that these two gentlemen took a essentially 20-hour round-trip drive at the very fastest you can get from Orlando up to Dunn, North Carolina is about 10 hours. Typically it might take 10 to 12 hours that they would take this long round-trip drive to a town that they couldn't identify to visit, supposedly visit these girls who they didn't know, a non-tourist destination. I think that probably is the most salient, the most important fact that would give rise, not the only fact, but maybe the most important one that would give rise to a reasonable suspicion. Can I ask you about that fact? Part of the problem here is sort of the language barrier that the trooper encountered. That's not her fault, that's just the reality of the situation that she encountered. What role should we take that into consideration given the fact it appears that Vila Vincencio was attempting to answer her questions as best he understood them. He pointed her to the GPS in terms of trying to figure out where it was that he had spent the night at the hotel. He said that there was a receipt that might identify the hotel. Admittedly, he indicated that he couldn't name the people that he was visiting that night, but in many respects those responses seem to be consistent with responses in other cases where we have said that there really isn't nothing all that suspicious about somebody referring a trooper to other places where they might find the information necessary to dispel a suspicion. Thank you for that question, Your Honor. This issue of the language barrier, I think, is one of the more interesting facets to this particular case because one of the things that she noticed is that Vila Vincencio's ability to comprehend English seemed to decline over the course of the encounter. Can we tell that from the video? Does the video support that or dispel that or is it inconclusive? As I looked at the video, I didn't get that sense, but on the other hand, a good bit of conversation that she might have had with him and perhaps the other individual was outside of the ability of the recorder or outside of the reach of the recorder. Tell me about that. That's correct, Your Honor. I had much the same reaction when I reviewed the videotape and I viewed it last night myself, but I'm basing that assertion on the portions of the record where she is describing her perceptions. I think this language barrier does give credence to maybe one the reasons why this encounter didn't transpire as quickly as it could have because there was a language barrier. Trooper Weissman in the suppression hearing testified that she did speak some Spanish. She'd studied Spanish in high school. She understood some Spanish words and images on the video. Her interspersing Spanish words here and there to help facilitate the communication and so that was a factor that slowed everything down, but in her perception, there was a sense he was able to understand her quite well in the beginning, but as the encounter went on, even as she was speaking slowly, interspersing Spanish words here and there to make sure there was understanding, she perceived his nervousness to increase. She perceived that he was not able to understand in ways that he was able to understand earlier on. Do you also take the position that the sort of evasiveness, determination, giving the inconclusive nature of the language evasiveness is a factual finding of the district court? It is, Your Honor, based upon the testimony, based upon what the district court saw from Trooper Weissman at the hearing, very much so, Your Honor. And Your Honor, I'd like to turn to this question of the rental agreement because one of the differences between the scenario we have here and the DiGiovanni case that's cited by the defendants is that we have two different drivers and this ties into the language and maybe some of the cultural barriers that were happening during this stop. Under the branch decision of this court, the maximum length of an acceptable traffic stop, they said that it can't be stated with mathematical precision, but the appropriate constitutional inquiry is whether the detention was longer than necessary given its purpose. And in branch, this court held that once the driver has demonstrated that he's entitled to operate the vehicle and the police officers issued the requisite warning, the driver must be allowed to proceed on his way. And the thing here is that there are two different things happening. She, of course, had to run the check on Villavicencio, make sure that there are no warrants, that his license is valid, and so on and so forth. But she's also looking at the rental agreement, noticing that Villavicencio is not an authorized driver. She knows that Rivera is in the car, but there's a difference between the name on the rental agreement, which says Isidoro Perez, versus the Rivera's driver's license, which says Isidoro Rivero. Now, in her testimony, she acknowledged the fact that Hispanic names are formatted differently. She knows that. She understands that. She also said, sometimes a person isn't doing anything wrong, but the DMV just screws it up. But regardless, she needed to make sure that Rivero was the same Rivero on the rental agreement, given the discrepancy between the driver's license and the rental agreement. And so it was entirely appropriate for her to prolong the stop to go and talk to Rivero. We can see that that eight-minute period after she issued the warning, that the stop was prolonged. But the reason it was prolonged, one of the reasons it was prolonged, is she still needed to verify, due to her due diligence, as she said in her testimony, that they were entitled to operate the vehicle. And while she's... But counsel, you would agree, and I think this is your colleague's point, you would agree, if she didn't have reasonable suspicion, the eight minutes of questioning was too long. Yes, Your Honor. It meant she could go up and ask her and talk to her about the rental agreement for some period of time. But you agree, at some point during that eight minutes, she had to have reasonable suspicion, either before she got out of the car or during that conversation, because confirming the rental agreement didn't take the eight minutes, and that's why the district court turned that on the reasonable suspicion finding. So you're not disagreeing with that conclusion? That is correct, Your Honor. We're not disputing that conclusion at all. As we look at the totality of these circumstances, what you see is sort of various points where she's developing reasonable suspicion. There were a number of different things that were highlighted in our brief, and that you also see in the testimony of Trooper Weissman. She noticed the fact, for example, that there were no travel comforts or visible luggage, you know, immediately upon pulling them over. May I ask about that? May I ask about that? So it's true, I guess, there was no luggage immediately visible in the back seat, but there was, in fact, luggage ultimately found in the, not the trunk, but the back of the SUV. And I'm having trouble understanding why the lack of visible luggage in the back seat wouldn't necessarily be all that suspicious, given the size of this vehicle and the logical conclusion that any luggage to be found would be found way in the back of the car. So what she talked about in her testimony was luggage and travel comforts. That was the term that she used in her testimony. And what she was perceiving in the moment, I mean, I think certainly that factor in and of itself would not necessarily give you reasonable suspicion. But it did strike her as odd that there was no luggage visible, nor any travel comforts, as she put it. But Your Honor is correct, because in the video, when they do search, there are two suitcases taken out of the back. But this was one of the things that she perceived, one of the things that she saw when she initially pulled them over. May I ask a follow-up question? So understanding that these cases are sui generis, and you can't really, it's hard to extrapolate a holding of one case to the particular facts of this case or any other, but we do have a number of cases, Bowman, for example, where the court essentially says that the fact that a driver can't initially, you know, identify the location to where he or she is headed is not necessarily suspicious. We've got Vaughn that talks about, admittedly talks about multiple cell phones perhaps being suspicious. But in that case, we had some burner phones that were particular, that were identified here. There were multiple cell phones, but multiple cell phones in and of itself is not necessarily something that the vast majority of travelers would or would not have. I mean, so there are a number of members of our court that I imagine would have multiple cell phones, one for work, one for personal use. I'm just having difficulty understanding why what seemed to be either innocuous or at least certainly not compelling, compellingly suspicious facts, however, even if you bring them together cumulatively, would amount to reasonable sufficient to extend the stop in this case. Your Honor, I think that's a very fair point, and I think that's one of the reasons we're here, kind of struggling over this and trying to understand kind of what were the points of reasonable suspicion. The government's position is that when you look at the totality of the circumstances, looking at all this evidence, giving due weight to Officer, to Trooper Weissman's testimony, that the trial judge's findings, that all of these factors put together, constituted reasonable suspicion that that was not clearly erroneous for the judge to make that finding. And I think that really is the key point that I was starting out with, is that each one of these cases, the facts are so different, they're so microscopically different in a granular way, and that's why the standard of review is so important. The question is, you know, so we give due weight to the testimony that was given by a witness who the trial judge found to be extremely credible, and looking back on it, perhaps if any one of us were the trial judge, we might view it in a different way, but looking at the totality of the circumstances, it was not clearly erroneous for Judge Dever to find that all these factors put together, the totality of the circumstances did provide reasonable suspicion. And so, Your Honor, we talked about the discrepancy in the names between the driver's license and the rental agreement. We also, one of the other points that I think points, that gets to this issue of reasonable suspicion, is Trooper Weissman had a great deal of experience. She's worked their highways for a very long period of time, and in her mind, as she's sort of perceiving what's happening, looking at the situation, interacting with both Rivero and Villavicencio, she found it to be extremely unusual that someone would spend over $600 on a rental vehicle, make a 20-hour round trip to stay for less than 24 hours in a non-tourist destination that they couldn't identify, with no travel comforts. Let me ask about that. So, if I understood the record correctly, the rental agreement was for more than just one day, is that right? That's correct, Your Honor. So, they had rented the vehicle about 11.30 p.m. on February 15th, and they were slated to return it at 9 a.m. on February the 18th. So, they would have presumably left Orlando late night on the 15th, come up to North Carolina at some point on the 16th, spent the night of the 16th at the hotel, and the morning of the 17th driving back to Florida, because they were heading south. They were very close to the North Carolina-South Carolina border. So, about a two-and-a-half, three-day rental? Exactly. Yes, a two-and-a-half, three-day rental for a one-day stay at a non-tourist destination without any travel comforts. Of course, we don't know what else he might have been using the car for locally. So, I guess my point is $600 over a two-and-a-half, three-day rental for a high-end SUV, which this was maybe still on the high end, but not all that exorbitant. One other point, and I don't know if you know the answer to this or not, but you touted the trooper's experience. She made a comment about the proclivity of people who work in the rental car industry being drug traffickers because they know where to keep items in SUVs and the like, particularly people who clean cars, I think she may have said. I've never heard of that. I don't think I've ever seen that in the cases that I've been involved in. Was there any factual support for that, or was that just her own personal experience? I think that was just based on her experience, Your Honors. I read that portion of the record. That was my understanding of where she came up with that particular assertion. Okay. Your Honors, I see that my time is up, and I just wanted to, again, appreciate the court and being able to do this by videoconference and ask that the court affirm the judgment of the district court. Thank you. Thank you very much. Mr. Marcelliot, you have some time for rebuttal. Thank you very much, Judge. Just to kind of go back and hone in on where I think the bulk of the questioning has been, and that's reasonable suspicion, to extend the stop and whether it existed and whether these cases are comparable to some prior cases. I think Judge Diaz hit the nail on the head with his question. I hope I didn't hit the nail on my head. On the head, Judge. Particularly with regard to Bowman, we think the government has completely failed to distinguish Bowman in any significant way, both today in oral argument and in their brief. There really wasn't even an attempt in the brief to distinguish Bowman, and it's a very important, very, very similar case. Yes, we understand that all these cases have their own unique facts, but there are facts that are commonly seen in the body of cases, and it just so happens to be those facts that the government is relying on to advance their case for reasonable suspicion. Counsel, let me ask you about the Socolow decision, and if you don't know it, don't rush into it, but a Supreme Court case from 1989, and I get that we can't just compare cases, but that is also a case where the court relied heavily on a very expensive trip over a very short period of time to give rise to reasonable suspicion. That was a flight from Honolulu to Miami, and so slightly different, but the court relied heavily on that in finding, and that's a fact not present in Bowman, but the court relied heavily, this isn't just 0995, or in that scenario, this is not just a trip to Miami, but this was a trip to Miami in the Socolow decision where it was a 20-hour flight and a two-day turnaround. Very similar in nature, it strikes me, to an 11.30 p.m. departure followed by a 10-hour drive leading to a one-night stay and a return trip the very next morning. That seems like a one-day adventure in North Carolina, and also very expensive, as we saw in Socolow. Why isn't that a better data point for us than the Bowman decision that lacks the key fact the government tried to illustrate in its argument? I appreciate you breaking down some of the facts of that case, because I'll have to concede I'm not all that familiar with that case. However, I will say that that case predates social media and dating apps like Tinder, and the explanation given by the defendant in this case is, I find, to be a reasonable one. They came to see girls, and in an era of social media and dating apps, I don't think it's surprising or uncommon to think that two gentlemen would spend a bunch of money to come to North Carolina to meet up with some girls, and social media makes that possible. And I understand that is a theoretical explanation, although I thought Tinder had a geographic focus on it, but maybe I'm wrong about that. I'm not a technological guy, so don't hold me to that piece. The point is that, yes, you can always dream up a possible explanation. The question is why the standard is so very low for reasonable suspicion. It's not whether there is a plausible, innocent explanation, but whether there's a reasonable explanation to the contrary. And to me, that's the challenge that you've got. The fact that it's not present, you know, is you have a very long travel in a short period of time with four cell phones. We could add the other facts, but I think that's sort of the core piece of it, with a very expensive car that looks a lot like Socolow to me, although admittedly that's not a car, it's a plane flight, but I'm not sure that that's the distinction. I think a point that Judge Diaz made with his question was well made, which is, you know, it's a higher-end SUV and they rented it for three days. I think $600 for a higher-end SUV for three days is probably about a market rate. I don't think they paid more than market, and I think they gave a legitimate response during this extensive, repeated questioning, which, by the way, never included... So I don't rent that many cars, I confess. Is there a record support that would refute the officer's professional experience that this was a very expensive rental over a short period of time? You may be right, but is there anything in the record that supports that conclusion? I don't think there were any facts put in place by the government or by the defense to say this is market or this is not market. We just have testimony with her saying she felt it was on the high side, but she didn't really indicate what she was basing that on. At the end of the day, what she's presented with, you know, you've got four cell phones. She testified because I crossed her on whether any of them were burners. She said no or she did not note that any of them were burners, so that's a fact that's distinguishable from prior cases. You know, a garden variety amount of nervousness from Mr. Villavicencio, there's no suggestion that his heart was beating through his sleeve or anything like that that we've seen in prior cases. Again, a supposed absence of luggage, which she says she relied on, and this is really important, there was actually luggage in the car. And we repeatedly questioned her on cross, both myself and other counsel in the suppression hearing, about the fact that whether the seats were raised and whether she would have even been able to see all the way into the back of the car to take anything from the fact that she couldn't see travel comforts in a large SUV standing at the passenger window and looking back. And her testimony that's in the record was that she couldn't recall whether the seats were up or not, but yet she's saying that she relied on this as one of her primary prongs of something that was unusual that she saw in the car. But later we find out there is actually luggage in the car in the exact place she would expect to find it. Not to bring you back to Socolow again, and I think we're about out of time, so I won't bring it back, but Socolow has a similar scenario where they relied on the fact that he had a different name at the phone number that he used. It turned out later that that was his roommate's name, and so that wasn't real suspicion. But the Supreme Court in Socolow said it was still reasonable for the officers to rely on that, even if it turned out that subsequent investigation would have revealed that it wasn't true. And so, you know, assuming that the district court did that she was credible, she didn't see luggage, she relied upon that, even if she turned out subsequent investigation revealed that not to be true, can't she still rely on that? Well, Judge, in some cases the government advances the opinion that a lack of luggage is suspicious, and in other cases the government advances the argument that luggage is suspicious. I understand that, but my point is, isn't she entitled to rely on her perception, even if that perception turns out to be mistaken based on further investigation? Not when she had to concede that she couldn't even recall whether she was able to see through the entire car. I don't think you can rely on that to advance reasonable suspicion. I think I'm out of time. You know, for all the reasons discussed, we strongly encourage the court to reverse, and we think it's justified in this case. Thank you very much, Mr. Marcelliot. I want to thank all the lawyers here today for being here, for presenting argument under some very unusual and, indeed, extraordinary circumstances. It is important that we continue to do our work as best we can, notwithstanding the difficulties that have engulfed our nation, and this is part of that process, that the government continue to work. We could not do our work without the contribution of lawyers such as yourselves. Typically, we would come down from the bench and greet you personally. We obviously can't do that here today, but that's not in any way a slight against you all and your contributions to our important work. So, on behalf of the court and my colleagues, I want to thank you very much, and the case is submitted. Thank you very much.
judges: Albert Diaz, Julius N. Richardson, Thomas E. Johnston